IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| ROGER BURKE, | Case No. 08 C 50136 |
| Plaintiff, | |
| vs. | Magistrate Judge |
| | P. Michael Mahoney |
| MICHAEL J. ASTRUE, | |
| Commissioner of Social Security, | |
| Defendant. | |

## MEMORANDUM OPINION AND ORDER

**I.     Introduction**

Roger Burke seeks judicial review of the Social Security Administration Commissioner's decision to deny his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the magistrate judge pursuant to the consent of both parties, filed on September 9, 2008. *See* 28 U.S.C. § 636(c); *Fed. R. Civ. P.* 73.

**II.    Administrative Proceedings**

Claimant first filed an application for DIB and supplemental security income ("SSI") on October 29, 1981. (Tr. 27.) The ALJ issued an unfavorable decision on December 15, 1982, and Claimant did not seek reconsideration. (Tr. 27, 97.) Claimant filed three subsequent DIB applications, which where denied in 1999, 2000, and 2002. (Tr. 28, 32, 180.) The Social Security Administration ("SSA") denied his claim on May 11, 2001. (Tr. 28, 32.)

Claimant filed the application for DIB in this case on February 15, 2004 alleging an onset

1

date of July 1, 1999. (Tr. 18.) The SSA denied Claimant's application initially on March 9, 2005, and upon reconsideration on June 16, 2005. (Tr. 18.) Claimant hired an attorney to handle the appeal, and filed a timely written request for a hearing on September 1, 2005. (Tr. 18.)

At the hearing on August 15, 2006, Claimant was represented by counsel, appeared, and testified. (Tr. 18.) During the hearing, Claimant and his attorney amended the alleged onset date to May 6, 2002. (Tr. 18.) Thomas F. Dunleavy, a vocational expert, testified at the hearing. (Tr. 18.) The Administrative Law Judge ("ALJ") issued a written decision denying Claimant's application on September 11, 2006, finding that Claimant was not precluded from performing his past relevant work given his residual functional capacity ("RFC"). (Tr. 18–23.) The ALJ also found that Claimant's job skills were transferable to other jobs that would accommodate his RFC, and that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. 22.) Because the Appeals Council denied Claimant's Request for Review regarding the ALJ's decision, the decision constitutes the final decision of the Commissioner. (Tr. 11.)

**III.    Background**

Claimant was born on May 6, 1947, making him 57 years old when his insured status expired on September 30, 2004, and 59 years old at his hearing on August 15, 2006. (Tr. 104, 111, 302.) At the time of the hearing, Claimant was single and living alone in a 128 year-old house. (Tr. 304–5, 319.) He graduated from high school and completed three years of college. (Tr. 305.)

Claimant's impairments are primarily residual injuries from an automobile accident in 1965. (Tr. 310, 320.) He was struck by a drunk driver, resulting in significant pelvis and leg

2

fractures, which caused his left leg to be shorter than his right. (Tr. 232.) The accident also resulted in a severe skull fracture and a chronic heel ulcer. (Tr. 232.)

Claimant worked as an automotive services technician from 1992–1999, where he repaired exhausts and installed tires and batteries. (Tr 307.) After 1999, he volunteered at an animal shelter in exchange for food until about six months prior to the hearing. (Tr. 309, 317.) He also helps care for an elderly woman who partially supports him. (Tr. 316–17.)

On August 15, 2006, Claimant testified in front of an ALJ at the administrative hearing about his injuries. (Tr. 300–25.) He testified that he lifted 30–50 pounds when he worked full-time as an automotive technician, and 20–40 pounds when he worked part time as a retail clerk. (Tr. 307–08.) He stated that he wore a silicone pad on his heel and spent a limited amount of time on his feet to prevent his ulcerated heel from opening up. (Tr. 310.) He compared the pain from bumping his heel to an electric shock, and testified that he could only walk a block and stand for an hour without aggravating his pressure-sensitive heel ulcer. (Tr. 311) He wears a shoe lift to compensate for his short leg, and has trouble going up or down stairs without falling. (Tr. 311–12.) Claimant stated that his ankle gives out frequently, which causes him to fall, and that doctors have recommended that he use a cane, crutches, and a wheelchair. (Tr. 313.) He testified that he could sit for an hour without discomfort, and could only lift 10–15 pounds without pain or weakness. (Tr. 312.) He also testified that his right hand went numb and right little finger curled up during activity. (Tr. 313.) Claimant testified that his heel pain made it difficult to sleep, and that his pelvic region and lower back felt like fire when he sat down at night. (Tr. 314.) He stated he takes frequent naps because his injuries cause fatigue. (Tr. 314). He testified that he was not taking any pain medications, but took a drug for rebuilding cartilage

3

and tendons. (Tr. 314.) Claimant stated that he had not been seeing a doctor because he did not have medical insurance. (Tr. 315.)

Claimant also testified about his physical capabilities and daily activities. He stated that he does his own grocery shopping, cooking, laundry, and cleaning, but has a friend come in to do the dusting because dust aggravates his allergies. (Tr. 315–16.) He testified that he takes out the garbage, and drives approximately 12 miles two or three times per week. (Tr. 317.) Claimant stated that he enjoys collecting native trees, reading, and watching the news or documentaries. (Tr. 318.) He stated that he does routine maintenance and repairs on his 128 year-old house, but quit working on the roof and trimming trees because these activities are dangerous given his condition. (Tr. 319.) Claimant also stated that he can only remain on his feet for about an hour and requires periodic rest when he does any work around the house. (Tr. 322–23.)

## IV. Medical Evidence[1]

Claimant was struck by an automobile and sustained substantial injuries in 1965. (Tr. 231.) After the accident, Dr. Diaz, Claimant's treating orthopaedic specialist, diagnosed Claimant with a fractured pelvis, dislocated left sacroiliac, possible damage to the sciatic nerve, fractured left tibia and fibula, severe laceration to the perineal region and open fracture of the skull with brain injury. (Tr. 231.)

In September 1997, Dr. Karesh, an internal medicine specialist at Dryer Medical in Aurora, IL, examined Claimant. He noted hypersensitivity in Claimant's chronic, non-draining left heel ulcer, and opined that no further treatment would be of value. (Tr. 238.) He also noted

---

[1] The court recognizes that pages 269–73 of the administrative record contain evidence that is unrelated to Claimant. The court will disregard this evidence.

4

that Claimant complained of right elbow pain, which radiated to his forearm and shoulder and was associated with overuse at work. (Tr. 238.) In December 1997, Dr. Karesh noted some atrophy in the left calf, and to a lesser extent, in the left thigh. (Tr. 237.) He indicated that Claimant's heel ulcer appeared to be healed with some chronic callus formation in the area. (Tr. 237.) He noted good range of motion in Claimant's hip and knees, and recommended that he wear a silicone pad to prevent irritation of his left heel. (Tr. 237.) In August 1998, Dr. Karesh noted Clamant's discomfort with hyperextension of the left knee, and recommended physical therapy and a hip x-ray. (Tr. 234.) The x-ray revealed evidence of extensive old trauma, but no acute abnormalities. (Tr. 236.)

In September 1998, Dr. Lacart, another orthopedic physician at Dreyer Medical, noted that Claimant complained of knee pain with hyperextension and some groin pain. (Tr. 235.) He also noted Claimant's leg length discrepancy and recommended a shoe lift. (Tr. 235.)

In December 1998, Dr. Karesh noted some numbness and tingling in Claimant's upper extremities and hands, but also noted that he had no muscle weakness. (Tr. 234.) Dr. Karesh speculated that Claimant might have carpel tunnel syndrome exacerbated by repetitive over-use at work. (Tr. 234.)

In August 1998, Claimant visited Dr. Levin, a podiatrist, for treatment of his ulcerated left heel. (Tr. 264.) Dr. Levin indicated that Claimant's ulcer was improving probably because of his part-time work schedule, and advised him against returning to full-time work. (Tr. 264.) Claimant returned for a check-up in December 1998, and Dr. Levin noted some increased irritation. (Tr. 264.) Dr. Levin dispensed new Silopads to Claimant two times during 1999. (Tr. 264.)

In December 1999, Dr. Karesh re-examined Claimant pursuant to a disability determination. (Tr. 232.) He noted Claimant's discomfort in the neck and shoulder area with range of motion, but added that he had normal strength in the upper body. (Tr. 232.) He noted that Claimant's mental status and neurological tests were normal. (Tr. 232.) He noticed atrophy in Claimant's left quadriceps, which he believed was due to his old peroneal nerve injury. (Tr. 232.) He noted tenderness on Claimant's left heel, but indicated that there was no drainage and that the ulcer had healed and scarred. (Tr. 232.) He opined that Claimant had reasonably good range of motion in his left ankle and could ambulate independently, but was somewhat restricted because of tenderness in the left heel. (Tr. 232.) Finally, he indicated that Claimant was unable to proceed with further laboratory investigations because of his financial situation. (Tr. 232.)

In February 2000, Claimant revisited Dr. Levin for the first time in two years. (Tr. 264.) He noted that Claimant had been working 15 hours per week at an animal shelter, and opined that Claimant's heel ulcer was the healthiest it had looked in a long time. (Tr. 262.) Dr. Levin added that Claimant felt he was unable to work more than 15–20 hours per week without re-aggravating the ulcer. (Tr. 264.) Claimant saw Dr. Levin again in February 2002. (Tr. 264.) Dr. Levin indicated that the ulcer was still closed, but there was fragile eschar, which, according to Claimant, is disturbed by extended periods of weight bearing and walking.[2] (Tr. 264.) He dispensed another Silopad and recommended that Claimant use cream daily. (Tr. 264.)

In May 2002, Dr. Kerpe reviewed Claimant's medical history. (Tr. 245.) He noted

---

[2]Eschar is a "thick coagulated crust or slough which develops following a thermal burn or chemical or physical cauterization of the skin." *Stedman's Medical Dictionary* 670 (28th ed. 2006).

Claimant's left hemiparesis from the skull injury, shorter left leg, and recurrent heel ulcer.[3]  (Tr. 245.)

In July 2002, Dr. Grayson, an internal medicine specialist in Geneva, IL, examined Claimant pursuant to his disability claim.  (Tr. 247–48.)  He indicated that Claimant complained of chronic pain in his left heel, weakness of the left arm and leg due to head injury, pain in the left hip after exertion, and shortening of the left leg due to an old tibia fracture.  (Tr. 247.)  Dr. Grayson noted that Claimant's heel was not ulcerated, and tested Claimant's grip strength in both hands at 5/5.  (Tr. 247.)  He indicated that Claimant's left calf was atrophied, and approximately two inches larger in circumference that the right leg.  (Tr. 248.)  Dr. Grayson also noted that Claimant's lower leg strength was 5/5 on the right, and 3/5 on the left.  (Tr. 248.)  Dr. Grayson diagnosed Claimant with atrophy of the left leg with weak extension, and suspected arthritis of the left hip, not demonstrated.  (Tr. 248.)

In July 2002, Dr. F. Paul LaFata, a state agency physician, assessed Claimant's residual functional capacity ("RFC") based on his medical record.  (Tr. 249–56.)  Dr. LaFata found that Claimant was able to lift 20 pounds occasionally, lift 10 pounds frequently, sit for six hours per day, and stand or walk for six hours per day.  (Tr. 250.)  He also found that Claimant was unlimited in his ability to push and/or pull, including the operation of hand and foot controls.  (Tr. 250.)  In determining Claimant's postural limitations, Dr. LaFata found that Claimant could balance, stoop, and kneel frequently, crouch, crawl, and climb stairs occasionally, and never climb ladders, ropes, or scaffolding.  (Tr. 251.)  He found no manipulative, visual, communicative, or environmental limitations.  (Tr. 253–54.)

---

[3]Hemiparesis is "weakness affecting one side of the body."  *Id*. at 866.

In May 2003, Claimant revisited Dr. Kerpe to address swelling of his right hand, locking of the second finger on his right hand, pain in his ulcerated left heel, and pain in his lower back. (Tr. 274.) Dr. Kerpe noted a slight catch with flexion and extension of the right second finger and slight tenderness of the lower lumbosacral spine.[4] (Tr. 274.) He diagnosed Claimant with trigger finger on the second finger of his left hand. (Tr. 274.) He also diagnosed Claimant with chronic lower back pain resulting from his shorter left leg, partial dropfoot, and a healed ulcer on Claimant's left heel.[5] (Tr. 274.) Dr. Kerpe offered to refer Claimant to orthopedic specialist and neurosurgeon, but Claimant disregarded the referrals because he had no insurance and was experiencing financial problems. (Tr. 274.)

In April 2004, Dr. Karri examined Claimant for the SSA. (Tr. 275-78.) Claimant's chief complaints were occasional tingling at the site of his skull fracture, pain and weakness on the left side, right hand pain that radiated to the shoulder, poor grip, numbness in right fingers, right sciatica, and hip pain. (Tr. 276.) Dr. Karri noted pain in the left heel from an unhealed surgical scar. (Tr. 276.) She also noted pins in his left ankle, which would give out causing him to fall frequently. (Tr. 276.) She indicated that Claimant must do everything slowly, but was able to handle objects normally. (Tr. 276.) During the exam, Claimant could get on and off the exam table, walk 50 feet without support, and grip and manipulate objects normally. (Tr. 277.) Claimant's mental status and neurological tests where normal. (Tr. 277.)

---

[4]Lumbosacral means "relating to the lumbar vertebrae and the sacrum." *Id*. at 1121.

[5]Dropfoot is a "partial or total inability to dorsiflex the foot, as a consequence of which the toes drag on the ground during walking unless a steppage gait is used; most often due to weakness of the dorsiflex muscles of the foot (especially the tibialis anterior), but has many causes, including disorders of the peripheral and central nervous systems, motor unit, tendons, and bones." *Id*. at 756.

In May 2004, Dr. Pardo, a state agency physician, assessed Claimant's RFC based on his medical record. (Tr. 279–86.) Dr. Pardo found that Claimant was able to lift 50 pounds occasionally, lift 25 pounds frequently, sit for six hours per day, and stand or walk for six hours per day. (Tr. 280.) He also found that Claimant was unlimited in his ability to push and/or pull, including the operation of hand and foot controls. (Tr. 280.) He found no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 281–83.)

In December 2004, Claimant visited Dr. Levin. (Tr. 299.) He indicated that Claimant's chronic left heel ulceration had eschar, but no acute ulceration, and that it deteriorates with work. (Tr. 299.) He dispensed another Silopad and instructed Claimant to return as needed. (Tr. 299.)

In January 2005, Dr. Karri reexamined Claimant, finding essentially the same conditions as she did in April 2004. (Tr. 289–92.) Claimant indicated that he was experiencing severe hip pain at night, which got worse with work and caused him to drag his left leg. (Tr. 290.) He also cited recurring problems with his ulcerated heel, but Dr. Karri indicated that it was completely healed. (Tr. 290.)

In July 2006, Claimant revisited Dr. Levin. (Tr. 299.) He noted that Claimant's ulcerated heel drains occasionally, but looked stable and dry. (Tr. 299.) He noted that Claimant had no acute problems. (Tr. 299.)

## V.     Standard of Review

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed de novo. *Binion v. Charter,* 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own

judgment for that of the [ALJ]." *Id*. The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel*, 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.").

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion*, 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.  Framework for Decision

"Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a

10

claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether any other work exists in significant numbers in the national economy which accommodates the claimant's residual functional capacity and vocational factors. The court will analyze each of these factors to determine whether the Commissioner's decision was supported by substantial evidence.

## VI.     Analysis

### A.     Step One: Is the Claimant Currently Engaged in Substantial Gainful Activity?

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he or she is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

In this case, the ALJ stated, "The claimant did not engage in substantial gainful activity during the period from his amended alleged onset date of May 6, 2002, through his date last insured of September 30, 2004." (Tr. 20.) Neither party disputes this determination. As such, the ALJ's Step One determination is affirmed.

### B.     Step Two: Does the Claimant Suffer From a Severe Impairment?

Step Two requires the ALJ to determine whether the claimant suffers from a severe impairment. A severe impairment is any impairment, or combination of impairments, which significantly limit the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c).[6] The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers a severe impairment, then the inquiry moves to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

In performing the Step Two analysis in this case, the ALJ found that Claimant had the following impairments: "(combination) residuals from motor vehicle accident; and left heel ulceration." (Tr. 20.) Because these medically determinable conditions significantly limited Claimant's ability to perform basic work activity, the ALJ recognized these impairments as "severe impairments" under 20 C.F.R. § 404.1520(c). (Tr. 20.)

The ALJ's finding that Claimant's severe impairments include residual injuries from the 1965 motor vehicle accident is slightly unclear. Presumably, the ALJ felt that some combination of the residual injuries together, and no one injury alone, constituted a severe impairment. But, the ALJ did not specify which, or how many, residual impairments constituted Claimant's "severe impairment." The ALJ should have better explained this determination, and listed the specific impairments that the ALJ determined to be severe. Regardless, neither party disputes the ALJ's determinations. As such, the court affirms the ALJ's Step Two determination.

---

[6] The claimant need not specify a single disabling impairment, as the Commissioner will consider combinations of impairments. *See, e.g.*, 20 C.F.R. § 404.1520(c). To simplify, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

C.  **Step Three: Does Claimant's Impairment Meet or Medically Equal an Impairment in the Commissioner's Listing of Impairments?**

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "listings"). The listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. § 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to a listed impairment, then the claimant is found to be disabled and the inquiry ends; if not, the inquiry moves to Step Four.

In performing the Step Three analysis in this case, the ALJ determined that Claimant's impairment did not meet or medically equal the level of severity contemplated for any impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 21.) The ALJ noted that Claimant did not meet the listing for "major dysfunction" of a joint under section 1.02 or have a "disorder of the spine" under section 1.04 because he can use his right upper extremity without any significant limitations and can ambulate effectively. (Tr. 21.) The ALJ ultimately found that these impairments would not prevent Claimant from performing a full or wide range of light exertional activity. (Tr. 21.) Neither party disputes this determination, and thus the court affirms the ALJ's Step Three determination.

D.  **Step Four: Is the Claimant Capable of Performing Work Which the Claimant Performed in the Past?**

At Step Four, the Commissioner determines Claimant's residual functional capacity ("RFC"), and whether this RFC allows Claimant to return to past relevant work. RFC is a

measure of the abilities which the claimant retains despite his or her impairment. 20 C.F.R. § 404.1545(a). The RFC assessment is based on all of the relevant evidence, including objective medical evidence, treatment, physicians' opinions and observations, and the claimant's own statements about his limitations. *Id*. Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive; the determination is left to the Commissioner who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *see Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

When a claimant makes statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms that are not substantiated by objective medical evidence, the ALJ must make an assessment of Claimant's credibility based on the case record as a whole. 20 C.F.R. § 404.1529(c)(3)(i)–(vii); S.S.R. 96-7p. In doing so, the ALJ must consider (1) the claimant's daily activities, (2) the location, duration, frequency, and intensity of claimant's pain, (3) precipitating and aggravating factors, (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms, (5) treatment, other than medication, for pain relief, (6) any measure used to relieve pain, and (7) functional limitations and restrictions due to pain. 20 C.F.R. § 404.1529(c)(3); S.S.R. 96-7p. The ALJ must create a "logical bridge" from the evidence in the record to his conclusions. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005).

Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565(a); S.S.R. 82-62. If the claimant's RFC allows him to return to past relevant work, the claimant will not be found disabled; if the claimant is not able to return to past relevant work,

the inquiry proceeds to Step Five.

In performing the Step Four analysis in this case, the ALJ determined Claimant's RFC, through the last date insured, to be the following:

> occasionally lift/carry (including upward pulling) 20 pounds; frequently lift/carry (including upward pulling) 10 pounds; sit (with normal breaks) for a total of 6 hours in an 8-hour workday; stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday; push/pull (including operations of hand and/or foot controls) unlimited other than as shown for lifting/carrying; no climbing ladders, rope, scaffolds; frequently balancing, stooping and kneeling; occasionally climbing ramp/stairs, crouching, or crawling.

(Tr. 21.)

In determining Claimant's RFC, the ALJ wrote that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence[.]" (Tr. 21.) The ALJ stated that she "also considered opinion evidence[.]" (Tr. 21.)

Unfortunately, the "objective medical evidence" considered by the ALJ in her opinion is sparse. All of the evidence the ALJ cited is in the context of evaluating Claimant's credibility. The ALJ noted that Claimant was in a motor vehicle accident when he was 17, and cited to the 1966 doctor's report from that accident. (Tr. 21.) She also noted that the accident left Claimant with one leg shorter than the other, for which he must wear a shoe lift. (Tr. 21.) To support that proposition, she cited the September 1998 report by Dr. Lacart. (Tr. 21.) These two medical records are the only pieces of objective medical evidence that the ALJ used to support her RFC finding. The ALJ also cited Dr. Levin's progress notes. However, the ALJ declined to give significant weight to Dr. Levin's report because "it was prepared by a podiatrist, who [saw] claimant very sporadically, [was] not a true treating source (SSR 06-03p), and failed to set forth

15

specific limitations." (Tr. 22.) Between these three doctors' reports, the ALJ did not cite a single doctor's report dated after 1998 to support her RFC. She only mentioned that Claimant's treatment was sporadic.

The ALJ acknowledged Claimant's testimony that he cannot walk more than one block, stand or sit longer than an hour, or lift more then 10 to 15 pounds. (Tr. 21.) She also noted his testimony that he used a cane, crutches, and a wheel chair because he had difficulty balancing. (Tr. 21.)

The ALJ relied heavily on Claimant's daily activities. The ALJ noted that he lives alone in a 128 year-old house, which he routinely repairs. (Tr. 21.) The ALJ also noted that Claimant collects trees, watches documentaries, and reads books about philosophy and the environment. (Tr. 21.) She noted that Claimant drives several times a week and did volunteer work until six months prior to the hearing. (Tr. 21.) The ALJ acknowledged that he was unable to trim trees or work on the roof, and that he has a friend help him vacuum and dust due to his allergies. (Tr. 21.)

The ALJ cites no evidence to support the specific limitations that she determined constituted Claimant's RFC. Somehow, the ALJ settled on a 20 pound occasional lifting limitation, a 10 pound frequent lifting limitation, a sitting limitation of six hours in an eight hour workday, and a standing limitation of six hours in an eight hour workday. But, neither of the two doctors' reports on which she relies bear any relation to those limitations. One report is simply about Claimant's 1965 vehicle accident, and is dated March 14, 1966. The other report refers only to the fact that Claimant has one leg shorter than the other. That report is dated September 8, 1998. The ALJ discussed Claimant's daily activities, but those activities do not, in

16

and of themselves, relate directly to the specific limitations in Claimant's RFC. They only indicate that he seems to be able to maintain his house, drive, and volunteer at an animal shelter.

Also, the ALJ failed to draw any logical bridge between the evidence she did cite and Claimant's RFC. The ALJ cited the evidence only to impeach Claimant's credibility. The evidence may be sufficient to indicate that Claimant is exaggerating his limitations, but the ALJ failed to articulate how the evidence supports her conclusions.

Even though the ALJ failed to cite substantial evidence to support her conclusions, and failed to draw any logical bridge from the evidence to her conclusions, there may be sufficient evidence in the record to support the ALJ's RFC determination. For example, in July 2002, Dr. LaFata found that Claimant was able to lift 20 pounds occasionally, lift 10 pounds frequently, and sit or stand/walk for six hours per day. (Tr. 250.) Dr. LaFata also found the same postural limitations as the ALJ. (Tr. 253–54.) In May 2004, Dr. Pardo found that Claimant was able to lift 50 pounds occasionally, lift 25 pounds frequently, and sit or stand/walk for six hours per day. (Tr. 280.) Dr. Pardo found no postural limitations. (Tr. 281.)

Also, Dr. Karesh, who examined Claimant five times, noted in December 1999 that Claimant's heel ulcer was "healed with some chronic callus formation in the area." (Tr. 237.) In December 1999, Dr. Karesh noted that Claimant was "somewhat restricted" because of tenderness in his heel, but stated that there was no drainage and the ulcer had healed and scared. (Tr. 232.) In July 2002, Dr. Grayson noted that Claimant complained of tenderness in his heel, but indicated that Claimant's heel was not ulcerated. (Tr. 247.) In May 2003, Dr. Kerpe noted that Claimant's heel ulcer had healed, but did not recommend any restrictions. (Tr. 274.) In December 2004, Dr. Karri noted that Claimant complained of recurring problems with his left

17

heel, but indicated that it was completely healed. (Tr. 290.)

Had the ALJ discussed this medical evidence in her opinion, or even acknowledged its existence, the court might be inclined to affirm her decision. Unfortunately, the ALJ failed to cite any medical evidence to support her RFC determination. Although she mentioned Claimant's daily activities, it was up to the ALJ to construct a logical bridge from substantial evidence in the record to justify her RFC determination. She did not adequately articulate how the RFC determination was based on the evidence she cited.

The ALJ also determined that, given his RFC, Claimant could perform his past relevant work as a service writer. (Tr. 22.) Claimant's past relevant work as a service writer was semi-skilled and involved medium exertion. The ALJ wrote, "The claimant's past relevant work as a service writer was semi-skilled and medium exertion as performed by him; however, [the job of service writer is] light exertion as generally performed in the economy according to the vocational expert." (Tr. 22.) The ALJ determined that Claimant could perform the job of service writer at light exertion.

The ALJ's opinion slightly mischaracterizes the VE's testimony. The VE testified that Claimant performed the job as service writer at a medium level of exertion. (Tr. 326.) The ALJ then asked, "[Are a]ny skills [that] the claimant obtained [as service writer] transferable to light or sedentary work?" The VE responded, "I would say the service writer position[,] although he performed it at medium[,] in other settings could be done at light." (Tr. 327.) However, the VE then stated, "Or excuse me. Actually, the transferability would be the retail sales part of it. So, retail sales person." (Tr. 327.) The VE explained that skills Claimant learned as a service writer could be transferred to other retail sales jobs that require only light exertion. The VE then stated

18

that a person with Claimant's RFC could not perform any of Claimant's past relevant work, including that of service writer. (Tr. 328.) Thus, even if the ALJ's RFC determination were supported by substantial evidence in the record, the ALJ's determination that Claimant can perform his past relevant is not supported by the record.

Despite the finding that Claimant could perform his past relevant work, the ALJ made a Step Five determination as well. Relying on the VE, the ALJ determined that significant jobs exist in the Chicago Metropolitan area for a person with Claimant's RFC. Claimant's transferable skills qualify him for the jobs of counter clerk (4,000–5,000 jobs exist in the Chicago Metropolitan area) and retails sales clerk (10,000). The ALJ also found that Claimant could perform the jobs of cashier (15,000), packager of small items (12,000), and assembler (15,000). Normally, this finding would be sufficient to determine that a significant number of jobs exist in the economy which Claimant could perform. However, the ALJ's RFC determination lacked citation to substantial evidence in the record and a logical bridge. Thus, the court cannot affirm the ALJ's Step Five determination at this time.

The court finds that the ALJ did not rely on substantial evidence from the record or sufficiently articulate her reasoning to establish a logical bridge from substantial evidence in the record to her RFC determination. Further, the ALJ misinterpreted part of the VE's testimony regarding Claimant's past work as a service writer.

**VI. Conclusion.**

For the forgoing reasons, the Commissioner's motion for summary judgment is denied and Claimant's motion for summary judgment is granted. This case is remanded for further administrative proceedings consistent with this Order pursuant to 42 U.S.C. § 405(g).

                                **E N T E R:**

                                _____
                                **P. MICHAEL MAHONEY, MAGISTRATE JUDGE**
                                **UNITED STATES DISTRICT COURT**

**DATE**: August 21, 2009